**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0472n.06

**No. 12-3760**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KHIM LAL GHIMIRE; PAVITRA GHIMIRE; ROSHAN GHIMIRE; ARJUN GHIMIRE, | ) ) ) | **FILED**<br>*May 10, 2013*<br>DEBORAH S. HUNT, Clerk |
| Petitioners, | ) ) | |
| v. | ) ) ) | ON PETITION FOR REVIEW OF THE BOARD OF IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., Attorney General, | ) ) | |
| Respondent. | ) ) | |

BEFORE:  ROGERS, WHITE, and ALARCÓN, Circuit Judges.[*]

ROGERS, Circuit Judge.  The Ghimires petition for review of a decision by the Board of Immigration Appeals denying their applications for relief and affirming the decision of the immigration judge.  They seek withholding of removal under 8 U.S.C. § 1231(b)(3).  The heart of the Ghimires' claim is an allegation that Maoists threatened Mr. Ghimire due to his party membership or political opinions.  The immigration judge made adverse credibility determinations regarding the Ghimires' testimony.  The Board properly upheld the immigration judge's decision because substantial evidence supports the immigration judge's adverse credibility determinations and the Ghimires have not otherwise provided enough evidence to support withholding of removal.

---

[*]The Honorable Arthur L. Alarcón, United States Senior Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

The Ghimire family consists of husband Khim Lal Ghimire, wife Pavitra Ghimire, and two minor children, Roshan Ghimire and Arjun Ghimire, ages fifteen and thirteen respectively. The Ghimires are natives and citizens of Nepal. According to Mr. Ghimire, while in Nepal, he joined the Nepali Congress Party, which seeks to establish democracy in Nepal. Mr. Ghimire said that although he never ran for office, he volunteered for the party during elections and was a well-known leader in his village of 15,000 to 20,000 people.

Mr. Ghimire testified that on or about December 25, 2000, two members of the Maoist Communist Party appeared at his home and asked Mr. Ghimire for a large donation, telling him that if he did not donate to the Maoist party, he might have "problems." Mr. Ghimire claimed that two days later, a group of twenty to twenty-five people armed with guns and knives came to his house in the night. The group demanded that he join the Maoist party because they believed that Mr. Ghimire's followers would then also join the Maoist party. Mr. Ghimire said he was told that the Maoists kill people that do not join their party. The Maoists demanded a large amount of money, but gave Mr. Ghimire one week to collect it.

Mrs. Ghimire's recollection of the event was different in important respects. She claimed that more than a hundred Maoists came to the Ghimires' house and that Mr. Ghimire's legs were injured with some small cuts when he fell down because the Maoists were making him walk in the dark.

Mr. Ghimire says that after this incident, he fled to Kathmandu, Nepal's capital. While there, Mr. Ghimire says that he saw an article in a newspaper called the *Media Times Weekly* that

mentioned the threats against him. According to Mr. Ghimire, while he was in Kathmandu, the Maoists came back to his house and demanded to know his whereabouts. It does not appear that the Maoists made any threats against Mrs. Ghimire or their children. There is no evidence that Mr. Ghimire or anyone else sought assistance from the police. According to Mr. Ghimire, they did not seek police assistance because the Maoists also ran the police away from his village, and if the Ghimires informed the police of what happened, the Ghimires would have more "problems."

Mr. Ghimire testified that, in April 2003, his mother wrote him a letter saying that the situation had not changed. Mr. Ghimire also received a letter from his brother in 2005 saying that the Maoists wanted to know Mr. Ghimire's whereabouts and also demanded that Mr. Ghimire's brother donate to the Maoists and work for their party. When Mr. Ghimire's brother refused, the Maoists looted his wholesale store and frightened him away from his house.

The Ghimires entered the United States on September 3, 2001 using nonimmigrant, B-2 visitor visas. The Ghimires overstayed their visas and did not seek asylum within the one-year period prescribed by 8 U.S.C. § 1158(a)(2)(B). According to Mr. Ghimire, they did not seek asylum because they were not aware of how to file a petition for asylum.

On February 9, 2005, the Government initiated removal procedures against all four members of the Ghimire family for overstaying their visas. In addition, the Government alleged that Mrs. Ghimire was removable under 8 U.S.C. § 1227(a)(2)(A)(i) for having been convicted in 2004 in a Michigan court of second-degree retail fraud, a misdemeanor punishable by a year-long sentence.

On April 19, 2006, the Ghimires each filed for asylum and withholding of removal based on Mr. Ghimire's political opinions, membership in the Nepali Congress Party, and a fear of being tortured. The immigration judge consolidated the Ghimires' individual removal proceedings and conducted six hearings.

The Government challenged the authenticity of the newspaper article that Mr. Ghimire offered. In support of this challenge, the Library of Congress's representative in Nepal searched the required register of newspapers kept by the Press Council of Nepal and three Nepali libraries. The representative did not find any copies of the *Media Times Weekly*. The Government then sought forensic analysis of the newspaper. The Forensic Document Laboratory of U.S. Immigration and Customs Enforcement was not able to authenticate the newspaper "due to the absence of comparable genuine sample newspapers in the [Forensic Document Laboratory] reference library." *See* Letter from Karen Cox, Forensic Document Examiner, to Tara L. Good, Assistant Chief Counsel, U.S. Immigration and Customs Enforcement, A.R. 222. The Ghimires sought to counter this evidence by offering affidavits from a journalist and an attorney in Nepal who both stated that many newspapers are short-lived and do not register with the Nepali government. The journalist also said he remembered reading the article about Mr. Ghimire. An additional issue with the article arose when the Government conducted its own translation of the article. Mr. Ghimire's translation says that the article reported the incident involving the Maoists threatening Mr. Ghimire as occurring on December 27, 2007, which is problematic as the paper is dated January 3, 2001. The Government's translation says the article referred to December 12, 2000 as the date of the incident.

The immigration judge concluded that the Ghimires were not eligible for asylum because their applications were not filed within one year of their entry into the United States and the Ghimires did not show their eligibility under one of the exceptions for extraordinary or changed circumstances.

The immigration judge also found credibility issues with Mr. and Mrs. Ghimire. The immigration judge found Mr. Ghimire's testimony "internally consistent," but "generally vague and unpersuasive." Oral Decision of the Immigration Judge, A.R. 97. Of greater concern to the judge were the contradictions between Mr. Ghimire's testimony and that of Mrs. Ghimire. The judge also expressed concern about the lack of corroborating evidence and noted that the authenticity of the article from *Media Times Weekly* could not be established. The judge did not find that the affidavits from the Nepali journalist and lawyer overcame the lack of official sources, in part because there was no evidence supporting the veracity of the affidavits. The controversy over the incident's date was of great concern to the judge. Based on the totality of the circumstances, the immigration judge found neither the Ghimires nor the article to be credible.

Based on this credibility finding, the immigration judge rejected the Ghimires' arguments for withholding of removal. The immigration judge found that the alleged incidents did not constitute persecution, and that even if they did, the Ghimires did not establish a nexus between these events and a protected ground. According to the immigration judge, it was more plausible that the Maoists were indiscriminately going from door to door demanding membership and donations than that the Maoists were targeting Mr. Ghimire based on his party membership or political opinion.

The immigration judge also concluded that the Ghimires had not established that it was more likely than not that they would be tortured, reasoning that even if upon their return to Nepal the situation were precarious, there was no evidence that Mr. Ghimire would be tortured.

The Board of Immigration Appeals (BIA) affirmed the immigration judge's decision, adopting and supplementing her oral decision. The BIA's decision noted that the Ghimires did not challenge the immigration judge's conclusion that the asylum application was time-barred. Accordingly, the BIA deemed the asylum issue to be waived. The Ghimires petition for review of the BIA's decision.

Although the Ghimires argued to the immigration judge and the BIA that their removal should be withheld under Article 3 of the Convention Against Torture, the Ghimires do not renew their Convention Against Torture argument before this court. Nor do the Ghimires attempt to revive their asylum claim.

The Ghimires' persecution claim is based on their story of what happened in December 2000. The immigration judge however did not believe this story and made adverse credibility findings against the Ghimires. Because substantial evidence supports the immigration judge's findings and the BIA's affirmance, the Ghimires' petition for review is without merit.

The Ghimires' failure to make an explicit challenge to the immigration judge's adverse credibility determinations is a waiver of a dispositive issue and thus supports denial of their petition for review. *See, e.g.*, *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1155 (6th Cir. 2010). However, even if this court understands the Ghimires' argument to make an implicit challenge to the adverse

credibility determinations, the Ghimires' petition for review fails. The testimony of Mr. and Mrs. Ghimire was inconsistent as to two key facts: the number of Maoists that confronted them and whether Mr. Ghimire was physically harmed. As the BIA said, this was "the most important event of their withholding claim." Decision of the BIA, A.R. 4. Under the REAL ID Act of 2005, which applies to this case, inconsistencies do not have to go to the heart of the claim to support an immigration judge's finding that a claimant is not credible. *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009). Here in any event there are inconsistencies at the heart of the claim, such that a reasonable adjudicator could conclude that the Ghimires were not credible. In addition, the immigration judge found the only direct corroborating evidence—the article from *Media Times Weekly*—could not to be verified as authentic. While it is possible that another immigration judge may have found the affidavits from the journalist and the lawyer to be sufficiently reliable, the evidence in the record is not so reliable that any reasonable adjudicator would be compelled to find either the Ghimires credible or the newspaper article authentic. *See* 8 U.S.C. § 1252(b)(4)(B). Accordingly, the BIA properly affirmed the immigration judge's adverse credibility findings.

Further, the immigration judge and BIA correctly concluded that the Ghimires' testimony did not rise to the level of past persecution. Based on the overall context, the verbal threats did not amount to persecution. *See Japarkulova v. Holder*, 615 F.3d 696, 700–01 (6th Cir. 2010). Without more evidence, the Ghimires' fear appears to be verbal harassment rather than "the sort of 'immediate and menacing' threat that amounts to persecution." *Id.* at 701 (quoting *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997)). In addition, the Ghimires did not establish a sufficient nexus

between a protected ground and the alleged threats. The immigration judge found that the Maoists were indiscriminately going from house to house seeking money rather than targeting Mr. Ghimire based on his political opinions or party membership. As the BIA noted, Mr. Ghimire testified that the Maoists were primarily interested in money and asked him to join their party before he informed them of his party membership.

There is substantial evidence supporting the immigration judge's findings regarding credibility and motivation. To show future persecution, the Ghimires can only rely upon the State Department's travel warnings and country reports, and letters from the Ghimires' relatives in Nepal. While this evidence suggests a country in turmoil, it does not establish any error with the BIA's or immigration judge's conclusions that the Ghimires have not met the high standard for withholding of removal based on fears of future persecution.

The Ghimires' petition for review of the BIA decision is denied.